**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**


**GREGORY M. SMYRNIOS,**

      **Plaintiff,**

**vs.**                             **Case No.  1:08cv121-MP/WCS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

      **Defendant.**

_____/


## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. LOC. R. 72.2(D).  It is recommended that the decision of the Commissioner be reversed and benefits awarded commencing with an onset of disability on July 26, 2001.

**Procedural status of the case**

Plaintiff, Gregory M. Smyrnios, applied for disability insurance benefits and supplemental security income benefits alleging an onset date of July 1, 2000.  R. 52. After his claims were denied, he sought review in case number 4:05cv307-RH/WCS.

Defendant filed an unopposed motion to remand and the claim was remanded pursuant to sentence 4 of 42 U.S.C. § 405(g) for another hearing.  R. 480-481.  After another hearing, the Administrative Law Judge determined that Plaintiff has been disabled beginning on February 17, 2005, but not before.  R. 478.  The denial of the claim for disability arising before February 17, 2005, is now before this court for review.

Plaintiff was 41 years old at the time of the administrative hearing, has a 10th grade education, and has past relevant work as a fisherman.  R. 431-432.  Plaintiff alleges disability commencing on July 1, 2000, due to degenerative joint disease of the lumbar spine, and depression.

The Administrative Law Judge found that prior to February 17, 2005, Plaintiff had the residual functional capacity to do light work with the limitations that he could sit or stand for only 30 minutes at a time, could not work on ladders or at heights, and was limited to occasional interaction with the public.  R. 469.  The ALJ determined that both before and after February 17, 2005, Plaintiff could not do his past relevant work, but before that date, he could do other work in the national economy (office helper, mail clerk, and surveillance system monitor), and was not disabled as defined by Social Security law prior to that date.  R. 476-478.

**Legal standards guiding judicial review**

**General rules**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable

person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002). "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted). The court must give "substantial deference to the Commissioner's decision." Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' " Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4. Does the individual have any impairments which prevent past relevant work?

5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  If the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Pain testimony**

Pain and other symptoms reasonably attributed to a medically determinable impairment are relevant evidence for determining residual functional capacity. Social Security Ruling 96-8p, p. 4. Pain and other symptoms may affect either exertional or non-exertional capacity, or both. *Id.*, p. 6.

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain. *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so. *See Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987). Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true. *See Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002). The reasons articulated for disregarding the claimant's subjective pain testimony must be based upon substantial evidence. Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991). It is not necessary that the ALJ expressly identify this circuit's pain standard if his findings "leave no doubt as to the appropriate result" under the law. Landry v. Heckler, 782 F.2d 1551, 1553-1554 (11th Cir. 1986).

"A claimant's subjective testimony supported by medical evidence that satisfies the pain standards is itself sufficient to support a finding of disability. Indeed, in certain situations, pain alone can be disabling, even when its existence is unsupported by objective evidence." Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (citations omitted). "[W]here proof of a disability is based upon subjective evidence and a

credibility determination is, therefore, a critical factor in the Secretary's decision, the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Id.* at 1562, *quoting*, Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983).

**Opinions of treating physicians**

The opinion of a claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). This is so because treating physicians:

> are likely to be the medical professionals most able to provide *a detailed, longitudinal picture* of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2) (emphasis added).[1]

The reasons for giving little weight to the opinion of a treating physician must be supported by substantial evidence. Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992). This circuit finds good cause to afford less weight to the opinion of a treating physician "when the: (1) treating physician's opinion is not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d

---

[1] Important to the determination of whether there is a "detailed, longitudinal picture" of impairments is the length of the treatment relationship, the frequency of examination, the extent of the knowledge of the treating source as shown by the extent of examinations and testing, the evidence and explanation presented by the treating source to support his or her opinion, the consistency of the opinion with the record as a whole, and whether the treating source is a specialist with respect to the particular medical issues. 20 C.F.R. § 404.1527(d)(2)-(5).

1232, 1240-1241(11th Cir. 2004); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir.

1991) ("The treating physician's report may be discounted when it is not accompanied

by objective medical evidence or is wholly conclusory."). *See also*, Crawford v.

Commissioner Of Social Security, 363 F.3d 1155, 1159 (11th Cir. 2004) (finding good

reasons articulated by the ALJ to discount the treating physician's opinion).

The ALJ must clearly articulate the reasons for rejecting the treating physician's

opinion. Phillips v. Barnhart, 357 F.3d at 1241.

> The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error. . . . Where the Secretary has ignored or failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true.

MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).

**Evidence from the Administrative Hearings**[2]

**The first hearing on July 25, 2003**

Plaintiff said that he had back surgery in 1998.[3]  R. 435.  He had not done any

significant work since then.  R. 436.

Plaintiff said he feels pain in his back, down his leg, and his leg "goes numb."  R.

437.  He said that in the prior six months he experienced numbness in his legs "pretty

---

[2] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at http://www.pdrhealth.com/drugs/drugs-index.aspx. Information about medical terms and prescription drugs come from DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, available at:  http://www.mercksource.com (Medical Dictionary link).  Social Security Rulings can be found at: http://www.ssa.gov/OP_Home/rulings/rulfind1.html.

[3] It appears from other evidence that this occurred in 1999.  The date is not particularly relevant, however.

often," "about every three or four days" lasting two or three hours or sometimes all day. *Id*.  He said that this caused his feet to swell "real bad" and he cannot walk very far.  R. 437-438.  He said that he stays off of his feet when the right leg is numb.  R. 438.  He said he had had these problems with his right leg for about the past two years, and was limited to walking about 200 yards.  R. 439.  He thought that he could stand for only about 15 minutes, and after that, his leg became numb.  R. 440.  He said that after walking for awhile, he had to sit down and put his feet up for 30 to 45 minutes.  *Id*.  He said he could sit for an hour and one-half with his feet up.  R. 441.  After that, he needed to move around.  *Id*.  He said he could sit almost all day with his feet propped up on a pillow if he had time for breaks to walk around.  R. 442.

Plaintiff said that the heaviest thing he could lift was about 5 to 10 pounds.  R. 444.  He could put away 20 five pounds packages of sugar at a time, but it would take him awhile.  *Id*.

Plaintiff said his pain level usually was at 9 or 10 on a scale of 10.  R. 445.  He takes pain medication three times a day.  *Id*.  Plaintiff was then taking Percocet[4] for

---

[4] Percocet, a narcotic analgesic, is used to treat moderate to moderately severe pain.  It contains two drugs – acetaminophen and oxycodone.  Acetaminophen is used to reduce both pain and fever.  Oxycodone, a narcotic analgesic, is used for its calming effect and for pain.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

pain, Soma[5] for muscle spasms, and Zyprexa[6] for bipolar disorder.  *Id.*  He said he did not have any side effects from these medications.  R. 446.

Plaintiff said he had not seen a psychologist or psychiatrist in four years.  R. 452. He had been diagnosed as suffering from bipolar disorder by a Dr. Lednik.  *Id.*

Plaintiff went to physical therapy for three months without improvement.  R. 431-432.  Exercise did not help.  R. 451.

Plaintiff did very little house work.  R. 446-447.  He could cook an egg and do some light laundry, but could not hang clothes on the line, chop vegetables, vacuum, mop, dust, or make beds.  R. 447-448.  He went to church about three times a year, but did not like to be around people and seldom stayed until the end.  R. 449.

The vocational expert testified that Plaintiff's prior work as a fisherman was semi-skilled and required heavy exertion.  R. 455.  The expert was asked to assume an individual with Plaintiff's age, education, and skill level, who could occasionally lift 20 pounds, frequently lift no more than 10 pounds, had a need to change positions every one to two hours, and was unable to stand or walk for more than an hour without changing position.  R. 455-456.  The expert said that such an individual could do light work with a sit or stand option.  R. 456.  He said that the individual could do work as a

---

[5] Soma is used, along with rest, physical therapy, and other measures, for the relief of acute, painful muscle strains and spasms.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[6] Zyprexa helps manage symptoms of schizophrenia, the manic phase of bipolar disorder, and other psychotic disorders.  It is thought to work by opposing the action of serotonin and dopamine, two of the brain's major chemical messengers. The drug is available as Zyprexa tablets and Zyprexa Zydis, which dissolves rapidly with or without liquid.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

ticketer (ticketing merchandise in a warehouse), assembler of small products, and mail clerk.  *Id.*  If the person were restricted to lifting no more than 10 pounds occasionally, with little contact with the public, the person could still do the jobs of assembler of small products and ticketer.  R. 457.

### The second hearing, on October 11, 2007

Plaintiff was 46 years old at the time of this second hearing.  R. 581.  Plaintiff said that he tried to mow a lawn on a riding mower but his back bothered him "really bad."  R. 585.  He said he experienced pain from his lower back into his legs and groin, and both legs went numb.  *Id.*  He experienced this level of pain two and one-half to three weeks a month, and he described this as his back "going out."  R. 586.  When this occurs, he sat around home watching television.  *Id.*  Plaintiff said he was in pain every day, and that he was never without pain.  R. 587.

Plaintiff used a cane for walking every day.  *Id.*  A wheelchair had been prescribed for his use about three months earlier, but he had used it only twice.  *Id.*  Plaintiff said that over the past ten years, he had received six to eight steroid shots, but the shots were not helpful.  R. 588-589.  A morphine pump had recently been suggested by his treating physicians.  R. 591.  He was taking Oxycodone[7] for pain and Xanax[8] for anxiety.  R. 591-592.  He said that he had had one or two back surgeries, but the surgeries did not help.  R. 591-592.

---

[7] Oxycodone is a semisynthetic narcotic with multiple actions qualitatively similar to those of morphine.  Its principal therapeutic value is for analgesia and sedation. PHYSICIANS' DESK REFERENCE (2005).

[8] Xanax is prescribed for management of anxiety disorder and for short-term relief of the symptoms of anxiety.  PHYSICIANS' DESK REFERENCE (2005).

Plaintiff said that since the hearing in 2003, he had experienced depression and anxiety caused by his back condition.  R. 589.  He said he cried a lot due to his inability to work.  R. 590.  He also was anxious and shaky everyday.  R. 590-591.

The ALJ posed a hypothetical to the vocational expert of an unskilled person of Plaintiff's age who could do limited light work, and would need to change position at least once an hour.  R. 601.  The vocational expert said that such a person could do work as an office helper, ticket seller, mail clerk, and surveillance system monitor.  R. 602.  With the limitation of occasional interaction with the public, the person could do all of these jobs except ticket seller.  R. 603.

**Medical Evidence**

Plaintiff was seen by a physician on November 8, 1999.  R. 224.  Back surgery for a bulging disc was said to have occurred in June, 1999.  *Id.*  Plaintiff complained of left side back pain radiating to his left groin.  *Id.*  He reported that he had tried to pick up or move a mower and this had caused the pain.  *Id.*  He said that the pain was severe and he could hardly move.  *Id.*  The physician's assessment was mild to moderate pain.  *Id.*  Plaintiff was observed to walk slowly into the examination room and had difficulty getting up onto the table.  *Id.*  Plaintiff had no forward or backward flexion, had severe muscle spasm, and was tender over the lower back.  *Id.*  Plaintiff could not do the straight leg raising test because it was too painful.  *Id.*  The physician's assessment was severe muscle spasms in the lower back, more on the left than right, from a strain.  *Id.*  Plaintiff was to follow up in a week.  *Id.*

Plaintiff returned on November 11, 1999, moving slowly and still very sore.  R. 223.  The pain was localized in the left lower back distal to the surgical site.  *Id.*  Plaintiff

denied any radiation of pain.  *Id.*  On examination, Plaintiff had decreased forward and backward flexion and extension, tenderness over the left lower back, but no pain in the left buttock or down the leg.  *Id.*  It was again thought that this pain was caused by strain from lifting the mower.  *Id.*

On November 15, 1999, Plaintiff's wife came to the clinic to advise that Plaintiff was having increased pain.  *Id.*  An MRI was scheduled.  *Id.*  The physician thought that if the pain became unbearable, Plaintiff might have to go to the hospital.  *Id.*  Plaintiff reported that he was still in a lot of pain on November 16, 1999.  R. 222.

Plaintiff had an MRI on November 19, 1999.  R. 221.  The MRI report concluded that there was a reduction in disc signal at L3-4, L4-5, and L5-S1, which indicated "disc dehydration and degeneration."  *Id.*  A mild central disc bulge was noted at L4-5 and L5-S1.  *Id.*  No definite disc herniation was found.  *Id.*  The findings suggested some edema in the paravertebral soft tissues on the right "suggesting that the recent prior surgery was at the L5-S1 level on the right side."  *Id.*  Degenerative disc changes were noted at L3-4, L4-5, and L5-S1.  *Id.*  There was no canal or foraminal stenosis.  *Id.*  Another report from the same MRI said that there were no significant disc bulges or herniations. R. 220.

On January 19, 2000, Plaintiff was seen by Debbie Goddard, advanced registered nurse practitioner.  R. 210.  She noted that Plaintiff had back surgery on May 21, 1999, was doing well, but injured his back lifting a lawn mower on November 7, 1999.  *Id.*  She said that he had had transportation problems getting to physical therapy, had attended three sessions, and had stopped because he thought that physical

therapy was of no benefit.  *Id.*  Plaintiff said that the only relief he got was from Lortab[9]

and Soma.  *Id.*  Nurse Goddard reviewed the November 19, 1999, MRI.  *Id.*  She

questioned whether Plaintiff was addicted to drugs because "[h]is pain seems to be

more than what his injury indicates."  *Id.*

Plaintiff was referred to Robert A. Greenberg, M.D., a year later (on February 2,

2001) for a consultative examination.  R. 110.  Plaintiff reported that he had experienced

back pain for the prior 17 years and had surgery in 1998.  *Id.*  He said he was taking

Lortab five times a day and Methadone, but with "very little relief."  *Id.*  Plaintiff said that

he was depressed due to back pain and inability to work.  *Id.*  Dr. Greenberg found that

Plaintiff had lumbar pain climbing onto the examination table, but no lumbosacral spasm

was noted.  R. 111.  Range of motion of the lumbar spine was only mildly decreased,

and other joints had full range of motion.  *Id.*  Decreased strength (4/5) in both legs was

noted.  *Id.*  Straight leg raising was positive for pain at 15 degrees.  *Id.*  Plaintiff walked

with a right leg limp.  *Id.*  No evidence of active inflammatory arthritis was present.  *Id.*

Based upon his examination, Dr. Greenberg's impression was that Plaintiff had "severe

low back pain" probably secondary to lumbar disc disease.  *Id.*  He concluded that

Plaintiff "would be unable to perform work related activities that require heavy lifting or

bending."  *Id.*

---

[9] Lortab is one of the brand names for hydrocodone.  PHYSICIANS' DESK REFERENCE
(2004), p. 3233.  Lortab is used to treat severe pain.  Dyer v. Barnhart, 395 F.3d 1206,
1211 (11th Cir. 2005).

On March 2, 2001, Plaintiff was seen by Philip K. Springer, M.D., for mental health care.  R. 152.  He reported to Dr. Springer that he had been doing heavy work at his house, which had raised his pain level.  *Id.*

On May 29, 2001, Plaintiff had another MRI.  R. 182.  The report stated that there were "no bony malignancies, fractures, nor displacements."  *Id.*  There was a loss of signal at the L3 through S1 discs.  *Id.*  There were no "focal disc herniations, extruded nor sequestered epidural disc fragments," and no "central spinal, foraminal nor lateral recess stenosis."  *Id.*  At the L4-L5 level, "slightly enhancing peridural scar tissue on the right side" was observed, "which may be involving the right L5 root."  *Id.*  "No significant peridural scarring is noted at the L5-S1 level."  *Id.*

There is a medical note dated July 9, 2001, from Steinhatchee Family Medicine that Plaintiff was dropped from the Pain Clinic program because he was taking more pain medication than prescribed.  R. 179.

The record contains notes of medical visits to Nurse Goddard from February 5, 2002, through May 15, 2003.  R. 254-259.  Plaintiff was seen six times during this period for ailments other than back pain.  *Id.*

On July 26, 2001, Plaintiff was first seen by Jesse A. Lipnick, M.D., at Rehabilitation Medicine Associates, P.A., for treatment of his spinal impairments and his knee problems.  R. 337.  Plaintiff said he had continuous pain at the highest level, 10 on a scale of 10.  *Id.*  He described the pain as sharp, with radiation of burning pain to his testicles and leg.  *Id.*  He said he had numbness of the right leg and weakness.  *Id.*  Plaintiff had run out of medications and had taken none for a month.  R. 338.  He said that he had not worked due to back pain and "nerves," experiencing alternate feelings of

anxiety and sadness.  *Id.*  On examination, Dr. Lipnick found that Plaintiff had muscular

rigidity bilaterally in the parathoracic and lumbar regions.  R. 339.  Plaintiff's range of

motion was reduced for flexion, extension, side bending, and rotation.  *Id.*  Some

decrease in sensation was noted over the right calf and right foot.  *Id.*  Dr. Lipnick's

diagnosis was chronic back pain, failed back, depression with generalized anxiety

disorder, rule out L5 radiculopathy, chronic narcotic usage, and chronic vocational

dysfunction.  *Id.*  Dr. Lipnick's plan was to obtain a recent MRI and consider an epidural

injection.  R. 340.  He recommended that Plaintiff walk briskly 1/2 hour a day.  *Id.*

OxyContin[10] was prescribed and an EMG[11] was ordered.  *Id.*  Plaintiff was congratulated

on cessation of smoking.  *Id.*  Plaintiff was to do a home program of stretching and

strengthening.  *Id.*

The EMG was performed on August 9, 2001.  R. 334.  It was an abnormal study

showing right S1 radiculopathy.  *Id.*  There was no evidence of peripheral neuropathy or

peripheral nerve entrapment in the legs.  *Id.*  Plaintiff was seen by Dr. Lipnick, whose

impression included this abnormal study, right S1 radiculopathy, failed back syndrome,

depression with generalized anxiety, chronic narcotic usage, and chronic vocational

---

[10] OxyContin is an opioid analgesic consisting of oxycodone hydrochloride; it has an abuse liability similar to morphine and is a schedule II controlled substance.  It is used to manage moderate to severe pain when a continuous, around-the-clock analgesic is needed for an extended period of time.  PHYSICIANS' DESK REFERENCE (2005).

[11] Electromyography, that is, an electrodiagnostic technique for recording the extracellular activity of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

dysfunction.  R. 333.  He prescribed Trazodone,[12] a Duragesic patch, Effexor,[13] and a right selective S1 nerve root blockade.  R. 333.

Plaintiff returned on August 21, 2001, to see Dr. Lipnick.  R. 331.  He reported that the Duragesic patches had helped only for a few days and his overall condition was worse.  *Id.*  Plaintiff was seen by Dr. Lipnick on August 30, 2001.  R. 326.  Straight leg raising was positive, and he had decreased sensation over the right calf and foot.  *Id.* Plaintiff returned to Dr. Lipnick on September 6, 2001.  R. 328.  He was not doing any regular exercise.  *Id.*  Plaintiff said that he was extremely nervous and anxious.  *Id.* Upon examination, Dr. Lipnick found Plaintiff to be very anxious and nervous, tense, rigid in the paralumbar muscles, and had reduced range of motion.  *Id.*  Plaintiff was still suffering from anxiety and nervousness on September 20, 2001.  R. 324.  He was walking and stretching on a daily basis, and this was somewhat helping with pain.  *Id.* The same objective findings consistent with Plaintiff's experience of pain were noted. *Id.*

Plaintiff saw Dr. Lipnick on November 15, 2001.  R. 322.  He was frustrated but not as depressed as in the past.  *Id.*  He reported that Xanax was helping with anxiety, and he asked for increased dosage.  *Id.*  Dr. Lipnick found that Plaintiff had full motor strength in the left leg, and decreased sensory levels in the right calf and right foot.  *Id.* The Xanax dosage was increased.  R. 323.  On December 13, 2001, Plaintiff's condition

---

[12] Trazodone hydrochloride, sold as Desyrel, is an antidepressant.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[13] Effexor is prescribed for depression.  PHYSICIANS' DESK REFERENCE (2004), p. 3413.

was unchanged, and Dr. Lipnick recommended that he walk briskly 30 minutes a day. R. 320-321.

An MRI was conducted on January 11, 2002.  R. 315.  The report noted mild degenerative disc disease with mild annular disc bulging at L5-S1 with moderate facet arthritis on the right.  *Id.*  A small central-right paracentral disc protrusion at L4-L5, and mild degenerative disc disease at L3-L4 and L4-L5, were observed.  *Id.*  Grade one spondylolisthesis[14] at L5-S1 was also noted.  *Id.*

Plaintiff's visit to Dr. Lipnick on February 7, 2002, showed his condition to be unchanged.  R. 313.  He received a trigger point injection, which provided immediate relief and was said to be helpful.  R. 314.

Plaintiff returned with his wife on March 7, 2002.  R. 311.  He told Dr. Lipnick that the medications were very helpful.  *Id.*

On April 8, 2002, Plaintiff returned to Dr. Lipnick complaining of pain in his right leg just above the knee.  R. 309.  He had been using a TENS unit loaned to him by a friend, which had helped with the back pain, and he asked Dr. Lipnick to prescribe that for him.  *Id.*  Dr. Lipnick found that Plaintiff exhibited a "moderate amount of pain behavior."  *Id.*  Straight leg raising was positive on the right.  *Id.*  A "palpable trigger point" was noted in the right thigh.  *Id.*  Dr. Lipnick's impression was right S1 radiculopathy as shown by the EMG on August 9, 2001, failed back syndrome, depression with generalized anxiety disorder, chronic narcotic usage, chronic vocational

---

[14] Spondylolisthesis is a condition in which a bone (vertebra) in the lower part of the spine slips forward and onto a bone below it.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.  A sign of this condition is that a straight leg raise may be uncomfortable or painful.  *Id.*

Case 1:08-cv-00121-MP-WCS   Document 19   Filed 12/31/08   Page 18 of 36

Page 18 of 36

dysfunction, unable to tolerate Duragesic, insomnia resistant to Trazodone, and a trigger point in the right thigh.  R. 310.  Dr. Lipnick gave Plaintiff an injection of Lidocaine at the trigger point, continued the prescriptions for OxyContin, Xanax, Soma, Effexor, and sent Plaintiff to physical therapy for evaluation of use of a TENS unit.  *Id.*

On May 8, 2002, Dr. Lipnick saw Plaintiff again.  R. 307.  Plaintiff still had knee pain, but the pain also emanated from his back, radiating around his hip and down his leg.  *Id.*  He said that the pain was unchanged from August, 2001.  *Id.*  Plaintiff could not afford the TENS unit.  *Id.*  Plaintiff said that the right S1 selective nerve root blockade had been very helpful for a short period of time, and he was interested in doing that again.  *Id.*  On examination, Dr. Lipnick found that Plaintiff's range of motion was reduced in flexion, extension, side bending, and rotation, and he had muscular rigidity.  *Id.*  Straight leg raising on the right was again positive and the trigger point on the right thigh remained.  R. 308.

On May 28, 2002, Plaintiff told Dr. Lipnick that he had twisted his back while backing his car out of the driveway, heard a popping sound, and "developed excruciating pain in his back."  R. 305.  Dr. Lipnick wrote: "He seems to be in considerable amount of pain at this visit."  *Id.*  Dr. Lipnick noted the following objective findings consistent with pain: bilateral paracervical and thoracic muscular rigidity, reduced range of motion, a palpable trigger point to the left of the lumbar spine.  *Id.*  Dr. Lipnick injected Lidocaine into muscles of the lumbar spine on the left.  R. 306.

On June 5, 2002, Plaintiff said that the injection had helped and he no longer had a spasm there.  R. 303.  Again, however, Dr. Lipnick thought that Plaintiff was in considerable pain during the visit, and found continued tenderness to palpation in the

Case No. 1:08cv121-MP/WCS

left of the lower spine.  *Id.*  The other objective findings of pain were again noted as

well.  *Id.*  Dr. Lipnick's impression remained the same with exacerbation of low back

pain "due to muscle spasms."  R. 304.

On July 8, 2002, Plaintiff told Dr. Lipnick that he was "doing well overall."  R. 301.

He still had a slight spasm, "but not nearly what it was a few months ago."  *Id.*  Dr.

Lipnick said that Plaintiff "has had a great reduction of pain since the trigger point

injection."  *Id.*  The same objective findings of chronic pain upon examination were

again noted, however, with the same decrease on reflex in the right ankle and

decreased sensation in the right calf and foot as noted previously.  *Id.*

On August 5, 2002, Plaintiff complained of increased pain in the lower back

radiating to his right leg.  R. 299.  The findings, impression, and prescription of pain

medication remained unchanged from previous visits.  R. 299-300.

Plaintiff continued to see Dr. Lipnick from October 1, 2002, through July 10,

2003.  R. 265-298.  Dr. Lipnick found Plaintiff to be in significant pain on all of these

visits, the objective findings on examination remained essentially the same, and pain

medications, notably OxyContin, or alternatively, Percocet, continued.  *Id.*  Plaintiff

found that Percocet was not as good as OxyContin for controlling the pain, but he had

developed an itch with OxyContin, and had had difficulty sleeping.  R. 293, 295.

On January 15, 2003, Plaintiff reported that he had bent over to pick up a laundry

basket and felt a snap in his back.  R. 290.  He reported an "immense pain in his low

back radiating to the right groin since that time."  *Id.*  The area was "extremely painful to

palpation," and "severe spasm" was noted on the right side of the lumbar spine. *Id.* He

walked with an antalgic gait.[15] *Id.*

On February 14, 2003, Dr. Lipnick gave Plaintiff a trigger point injection of

Lidocaine. R. 289. On March 14, 2003, Dr. Lipnick wrote:

> He does not have any severe spasms requiring trigger point injection
> today but he continues to have spasm on and off in his back. He says he
> does try to do some stretching. If he stretches too much though, he feels
> some popping in his back. He also tries to walk, and the walking helps the
> pain and sometimes worsens it. He has learned how to space his
> activities to deal with the spasm and back pain.

R. 286. The area of the right lumbar spine was still extremely painful to palpation. R.

287.

On March 24, 2003, Plaintiff told Dr. Lipnick that he had "intensive" low back

pain. R. 284. He tried to move a 50 to 75 pound bird bath, causing an immediate onset

of pain to the left and right of his spine. *Id.* On examination, Dr. Lipnick found

"intensive pain" that was exacerbated by extension of the spine or turning to either side.

R. 285. A trigger point injection of Marcaine and Depo Medrol was provided the next

day. *Id.* and R. 282-283. Plaintiff had reported low back pain of 8 before the procedure,

and zero after the procedure. R. 283. Dr. Lipnick scheduled a second set of injections

and resumption of physical therapy. *Id.*

However, on April 15, 2003, Plaintiff said that the pain relief from the injection

"lasted only until he left the building." R. 280. He told Dr. Lipnick that he exercised on a

regular basis. *Id.* Pain in the lower spine was again noted on examination. R. 281.

---

[15] Dr. Lipnick's medical records are usually two pages long. The second page of this
medical report, containing the impression and prescriptions, is missing. It is not
important, however, to this court's review.

Plaintiff had a steroid injection on May 6, 2003.  R. 277.  On May 14, 2003,

Plaintiff reported to Dr. Lipnick that neither of the two injections were very helpful to

control the back pain.  R. 275.  Dr. Lipnick entered the same objective findings

indicative of pain as before.  R. 276.

On May 31, 2003, Plaintiff had an MRI of his lumbar spine.  R. 269.  At the L3-L4

level, enhancing epidural scar formation was found on the right, with a small recurrent

disk protrusion within the scar.  *Id.*  It was thought that this, "if significant, could be

affecting the traversing right L4 nerve root."  *Id.*  At the L4-L5 level, mild epidural scar

formation was seen on the right, but without evidence of recurrent disk herniation.  *Id.*

However, there was "[m]oderate to advanced right neural foraminal narrowing . . .

present which could be impinging on the exiting right L4 nerve root" and "could

contribute to right L4 symptomatology."  *Id.*  At the L5-S1 level, there was no significant

epidural scar formation or evidence of recurrent disk herniation, and there did not

appear to be any nerve root compression.  R. 269-270.  The report said that "[w]ith the

exception of the small recurrent disk protrusion at L3/4 on the right, there has been little

or no significant change at the other levels since the prior study."  R. 270.

Plaintiff returned to Dr. Lipnick on June 13, 2003.  R. 267.  Dr. Lipnick reviewed

the latest MRI study, stating that it showed the post-operative changes at L3-L4 on the

right with mild epidural scarring and recurrent disk herniation within the epidural scar

that could potentially be affecting the right L4 nerve root.  R. 268.  He also noted that

there was moderate to advanced right neural foraminal narrowing at L4-L5 which could

be impinging on the exiting right L4 nerve root.  *Id.*  Finally, he mentioned that the MRI

showed grade I anterolisthesis of L5 on S1, unchanged from the prior study.  *Id.*

On July 10, 2003, Dr. Lipnick said that Plaintiff that day complained mostly of knee pain.  R. 265.  Pain in the lower back and knee was noted during the examination.  R. 265-266.

On July 28, 2003, Dr. Greenberg was asked to fill out another Residual Functional Capacity Evaluation by Consulting Physician form based upon the examination on February 2, 2001.  R. 261.  Dr. Greenberg said that he thought that Plaintiff could sit and work for one to two hours at a time and could do work while sitting for four to five hours a day with five minute breaks.  *Id.*  He thought that Plaintiff could stand for 30 minutes to an hour, and could work standing three to four hours a day with five minute breaks.  R. 262.  He said that he thought that Plaintiff could work five to six hours a day with a sit or stand option.  *Id.*  Finally, Dr. Greenberg said that he thought that Plaintiff could frequently lift one to five pounds and could occasionally lift the same amount during a workday.  R. 263.  He said that he based these opinions upon his observations that Plaintiff had decreased range of motion of the lumbar spine with pain, positive straight leg raising bilaterally, and decreased strength in both legs.  *Id.*  On November 27, 2006, after remand, Dr. Greenberg was asked by the Administrative Law Judge to clarify his July 28, 2003, opinion.  R. 494.  Dr. Greenberg explained that he did not re-examine Plaintiff when he completed the form in 2003, and that he did not feel there were any inconsistencies between his 2001 narrative opinion and his 2003 opinion.  R. 495.

On September 3, 2003, Dr. Lipnick filled out a similar Residual Functional Capacity Evaluation form.  R. 346.  Dr. Lipnick checked several options in several places.   Dr. Lipnick explained that he intended to convey that a range of answers would

be correct, but for the "purpose of this form," "take the answer which requires the most time at work."  R. 344.  In other words, the check mark indicating that Plaintiff could do more of such work, for a longer period of time, rather than less of such work, best expressed Dr. Lipnick's residual functional capacity opinion.  With that understanding, Dr. Lipnick said that Plaintiff could sit and work for 30 minutes to an hour, and, with five minute breaks, could work while sitting for 5 to 6 hours per day, 5 days a week.  R. 346. Dr. Lipnick said that Plaintiff could stand up to 30 minutes at one time, and could work standing up to 4 hours a day with five minute breaks.  R. 347.  With a sit or stand option, Dr. Lipnick said that Plaintiff could work up to 4 hours a day.  *Id.*  Dr. Lipnick felt that Plaintiff could carry up to 9 pounds frequently and up to 15 pounds occasionally.  R. 348.

On May 26, 2004, ARNP Goddard wrote a letter expressing her opinion concerning Plaintiff's impairments.  R. 367.  She stated that Plaintiff "is unable to work and provide for his family."  *Id.*  She repeated that Plaintiff "is unable to work."  *Id.*  She said that Plaintiff "had a long course of physical therapy and pain management."  *Id.*

On June 25, 2004, Dr. Lipnick expressed another opinion as to Plaintiff's ability to work.  He said:

> Mr. Smyrnios has been under my care since July 2001.  I have been treating him for back pain and have diagnosed him with right S1 radiculopathy.  Because of his injury and nerve damage, the patient is unable to stand for more than 30 minutes at a time.  He requires frequent position changes because of pain.  He is unable to lift more than 10-15 lbs.  Therefore, I believe he has a very limited capacity for gainful employment.

R. 366.

On August 17, 2004, Plaintiff was seen by Dr. Lipnick.  R. 387.  He was found

that day to have moderate pain behavior and had limited range of motion.  *Id.*  The

results of the May 31, 2003, MRI were discussed.  R. 388.  Plaintiff was again taking

OxyContin.  *Id.*

Plaintiff came back to Dr. Lipnick on September 16, 2004.  R. 385.  Plaintiff

wanted to switch back to Percocet.  *Id.*  Plaintiff's spinal range of motion was limited due

to pain and he walked with an antalgic gait.  *Id.*  Dr. Lipnick's impression in part

was bilateral lower lumbar facet dysfunction and right S1 radiculopathy.  R. 386.

On October 18, 2004, Dr. Lipnick again observed "moderate" pain behavior, with

limited range of motion due to pain and an antalgic gait.  R. 383.

An EMG study was conducted on November l7, 2004.  R. 282.  The results were

again abnormal.  *Id.*  The study revealed right L4 radiculopathy with chronic axonal loss

and reinnervation, but with no evidence of peripheral neuropathy or nerve entrapment in

the right leg.  *Id.*  An epidural steroid injection was discussed and rejected as Plaintiff

said that it had only brought temporary relief in the past.  R. 379.

Dr. Lipnick saw Plaintiff again on January 13, 2005.  R. 375.  Plaintiff reported

that his condition remained the same.  *Id.*  Dr. Lipnick said: "Greg tells me he cannot

work secondary to pain, anxiety and a variety of mental complaints.  I agree."  *Id.*  Dr.

Lipnick's objective findings remained the same as on all other visits.  *Id.*  Plaintiff was to

continue his home exercise stretching program and continue medications, including

Percocet.  R. 376.

On February 17, 2005, an MRI of Plaintiff's spine revealed a herniated disc

fragment at L3-L4 on the right, compressing the thecal sac and extending into the lateral

recess below the disk with moderate enhancement surround the fragment.  R. 399.  The physician reporting these results said that "this is likely of clinical significance and correlation for right sided radicular symptoms of the traversing L4 and L5 roots on the right is recommended."  *Id.*  This MRI is the basis for the ALJ's determination that Plaintiff first became disabled on February 17, 2005.  R. 475.

Dr. Lipnick continued to treat Plaintiff.  The record contains notes from visits on February 14, 2005, March 10, 2005, April 7, 2005, and May 6, 2005.  R. 390-397.

On May 6, 2005, a "Clinical Assessment of Pain" form was filled out by an Advanced Registered Nurse Practitioner at Rehabilitation Medicine Associates.  R. 402.  It was the nurse's opinion[16] that Plaintiff's pain was continuous.  R. 403.  The nurse said that it could be expected that Plaintiff would experience sleepiness, euphoria, sedation, and constipation as side-effects from his pain medications.  R. 404.  Relying upon the subjective reports of Plaintiff and objective medical findings, the nurse rated Plaintiff's pain as "marked," that is 6 or 7 on a scale of 10.  R. 405.  The nurse said that Plaintiff's ability to perform activities within a schedule was extremely restricted, that is, that Plaintiff had no useful function.  R. 406.

**Legal Analysis**

Plaintiff contends that the Administrative Law Judge did not correctly apply this circuit's rules for determining the credibility of a claimant's pain testimony and did not give proper weight to the opinion of Plaintiff's treating physician, Dr. Lipnick.  The two arguments are connected and will be considered together.

---

[16] The signature is illegible so the nurse's name is unknown.  R. 407.

The ALJ determined that Plaintiff's medically determinable symptoms could reasonably be expected to produce the symptoms he experiences, but that Plaintiff's testimony as to the intensity, persistence, and limiting effects of those symptoms were not entirely credible for the period prior to February 17, 2005, because "there is simply not enough objective medical evidence" to support that testimony.  R. 476.  This finding was preceded by a discussion of the medical evidence.

The ALJ accurately set forth the several disability opinions in this record by Dr. Lipnick and stated that "great weight" was to accorded those opinions, "which show the progression of the claimant's back problems."  R. 474, 476.  The ALJ found that Dr. Lipnick's opinions supported a finding that prior to February 17, 2005, Plaintiff could do a limited range of light work.  R. 474.  As discussed ahead, this was error and a misreading of Dr. Lipnick's 2003 opinion.

But first, there is the issue of the treating of the consulting opinion of Dr. Greenberg.  The ALJ had earlier had noted Dr. Greenberg's 2001 examination, finding no "gross clinical abnormalities."  R. 470.  She noted his objective findings that confirmed some pain and disability (pain on climbing up on the table, positive straight leg raising, mild loss of muscle strength in both legs), but also noted the only work limitation that Plaintiff avoid heavy lifting or bending.  R. 470-471.  The ALJ then discussed the contrasting 2003 residual functional capacity opinion by Dr. Greenberg. R. 471.   The ALJ disagreed with Dr. Greenberg's conclusion that the 2001 opinion and the 2003 opinion were not inconsistent, finding that the 2003 opinion listed "much more significant limitations."  *Id.*  The ALJ determined that Dr. Greenberg's 2001 opinion was

more reliable than the 2003 opinion, which had been prepared two and one-half years later without any intervening knowledge of Plaintiff's condition.  *Id.*

Even though the 2003 opinion of Dr. Greenberg is much the same as the 2003 opinion of the treating physician, Dr. Lipnick, the rejection of Dr. Greenberg's opinion is consistent with the law and supported by substantial evidence in the record.  A consultative examination, that is, a one-time examination by a physician who is not a treating physician, need not be given deference by the Commissioner.  McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987).  The 2001 opinion was inconsistent with the 2003 opinion.  A limitation to "avoid heavy lifting" (in the 2001 opinion) is reasonably interpreted to mean that the patient can do other many other forms of work requiring lesser exertion, despite the findings of significant pain in the 2001 examination.

The ALJ also noted that in March, 2001, Plaintiff said his pain had increased because he had been doing heavy work at home.  R. 152.   The ALJ cited this as evidence that Plaintiff "was not precluded from work at a lesser exertional level."  R. 471-472.  The record does contain several reported instances of back injury due to Plaintiff's attempts to lift heavy objects at home.  The significant point from this evidence is that in all the reported instances of attempts to do heavy work, Plaintiff injured himself and suffered severe pain.  It is evidence that Plaintiff attempted to do heavy work and failed.  As such, it is important evidence that Plaintiff could not return to his prior heavy work as a commercial fisherman.  But that Plaintiff attempted to do work at home and caused severe injury to himself is not substantial evidence in the record to conclude that Plaintiff has the residual functional capacity to do light work eight hours a day, five days a week.

The ALJ also mentioned the finding of ARNP Goddard, that Plaintiff's pain seemed to be more than indicated by his injury, and she questioned whether Plaintiff was addicted to pain drugs.  R. 472.  This was a finding on January 19, 2000, rather early in the steady decline of Plaintiff's health.  Moreover, the ALJ's apparently favorable reliance upon Nurse Goddard's speculation, that Plaintiff's subjective complaints of pain seemed to be more than indicated by his injury, was not reasonable.  The ALJ *rejected* Nurse Goddard's 2004 opinion that Plaintiff was disabled and unable to do any work, finding that "an ARNP is not an acceptable medical source."  R. 473.  Nurse Goddard's opinions concerning Plaintiff's disability were either reliable or they were not.

The ALJ also observed that Nurse Goddard had noted that Plaintiff had been dropped from the pain clinic for taking more prescription medications than ordered.  *Id.* Yet Plaintiff was seen by Dr. Lipnick for a number of years.  Dr. Lipnick continuously treated his pain with opioid medications during those years with no indication that Plaintiff was not following his instructions in the use of the medications.

The ALJ also noted that Plaintiff did not return to Steinhatchee Family Medicine for an eight month period, from February 5, 2002, to October 7, 2002.  *Id.*  The ALJ also noted that on a visit on March 21, 2003, "[a]gain, no complaints of back pain were voiced."  *Id.*  These observations seem to indicate a belief that during the period of 2002 and 2003, Plaintiff was not suffering from significant pain.  ARNP Goddard, however, primarily treated Plaintiff for ailments other than for back pain.  Dr. Lipnick was Plaintiff's back pain treating physician from July, 2001, onward.  Plaintiff saw Dr. Lipnick every month.  Thus, a lack of notation in Nurse Goddard's records about complaints of back pain is to be expected.

The ALJ accurately reported the findings of the May, 2001, MRI, which revealed normal height and alignment of the lumbar vertebral bodies, with no abnormal marrow signals, and no bony malignancies, fractures, or displacements. R. 472. While there was a loss of signal between the L3 and S1 disc levels, she observed that there was "no focal disc herniation." *Id*. The ALJ noted the possible "involvement" of the right L5 root due to slightly enhancing peridural scar tissue on the right side at L5-S1. *Id*. She observed, however, that on June 6, 2001, Plaintiff reported to Nurse Goddard that he had increased back pain radiating to his right leg with numbness of his toes, would seem to correlate with the MRI finding. *Id*.

The ALJ also accurately reported the MRI findings from January 11, 2002, R. 473, and the MRI of October, 2004, and the EMG findings in November, 2004. R. 475.

The ALJ reviewed the treatment records of Dr. Lipnick from July, 2001, through July, 2003. R. 473-474. The ALJ noted that Dr. Lipnick found Plaintiff to be in no acute distress on July 26, 2001. R. 473. The ALJ also noted, however, that on the same day, Dr. Lipnick found that Plaintiff had muscular rigidity bilaterally in the parathoracic and lumbar regions, had reduced range of motion in the back for flexion, extension, side bending, and rotation, and had decreased sensation over the right calf and right foot. *Id*. Not mentioned was the fact that OxyContin, a strong pain medication, was prescribed and an EMG was ordered. R. 339-340. Plaintiff remained on a steady prescription of OxyContin and Percocet throughout the period leading to February 17, 2005, the date that disability was finally approved. The comment that Plaintiff was "in no acute distress" was true: the distress was chronic. It was not substantial evidence in

the record to discount Plaintiff's pain testimony or to find him capable of doing a limited range of light work.

The ALJ cited the visit on August 21, 2001, as an occasion when Plaintiff complained of inability to sleep.  *Id.*  The trigger point injection on February 7, 2002, was also mentioned.  *Id.*  The ALJ noted that on March 7, 2002, Plaintiff said that "the medications [injections] were very helpful," but only for a few hours.  *Id.*  The ALJ reasoned that Dr. Lipnick "failed to impose any exertional or nonexertional limitations and never opined that [Plaintiff] was disabled."  R. 474.  That medications were only helpful for a few hours was not a good reason to discount Plaintiff's pain testimony. That Dr. Lipnick did not impose any exertional limitations is not either.  Plaintiff was not employed and had not been employed for several years.

The ALJ pointed out that in January, 2005, Dr. Lipnick said he agreed with Plaintiff's opinion that he was unable to do any sort of work.  R. 475.  The ALJ rejected this opinion.  She reasoned:

> Dr. Lipnick provided no basis for his opinions, but rather appeared to concur with the claimant's subjective complaints.  The undersigned does not accept this opinion because it is not consistent with Dr. Lipnick's other opinions and not supported by objective medical evidence.  Not until February of 2005 did an MRI reveal a herniated disc fragment at L3-4. The undersigned finds disability is supported at this point.

R. 475.  In effect, therefore, the ALJ said that she was giving the opinions of Dr. Lipnick great weight, but rejected a disability opinion he rendered on January 13, 2005, finding instead that disability began on February 17, 2005, due to the MRI on that date. Admittedly, a determination of the exact date onset of disability is difficult to establish, but the formulaic rejection of Dr. Lipnick's January, 2005, opinion, when the evidence to

support that opinion was found in an MRI a month later, seems a bit unreasonable, especially since the ALJ had give "great weight" to Dr. Lipnick's earlier opinions.  The defect in Plaintiff's spine that was revealed in the February MRI surely existed in January.

But the more serious problem is the conclusion that Dr. Lipnick's January, 2005, opinion was inconsistent with his earlier opinions.  The ALJ had determined that prior to February 17, 2005, Dr. Lipnick had expressed the opinion that Plaintiff could do a limited range of light work.  That conclusion is not supported by this record.  On September 3, 2003, Dr. Lipnick said that Plaintiff could work while sitting for no more than 5 to 6 hours a day, could work while standing for 30 minutes at a time for no more than 4 hours a day, and if allowed to work alternatively sitting and standing, could work only 4 hours a day.  R. 344-348.  On June 25, 2004, Dr. Lipnick explained that:

> Because of his injury and nerve damage, the patient is unable to stand for more than 30 minutes at a time.  He requires frequent position changes because of pain.

R. 366.

These opinions do not support a conclusion that Plaintiff was able to do a limited range of light work because, however one combines the methods of working, Plaintiff could not work for more than 4 to 6 hours a day.  The Commissioner's rulings provide that in determining residual functional capacity:

> Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis.  *A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.*

S.S.R. 96-8p (emphasis added, footnote 2 omitted).[17]  *See*, Kelley v. Apfel, 185 F.3d 1211, 1214 (11th Cir. 1999) (quoting the regulation, but not determining whether the ability to do part-time work would preclude a finding of disability at Step 5).  Our circuit continues to rely upon S.S.R. 96-8p with apparent approval, quoting Kelley. Carson v. Commissioner of Social Sec. Admin., 2008 WL 4962696, *2 (11th Cir. Nov 21, 2008) (not selected for publication in the Federal Reporter, No. 08-13217).  *See also*, Hines v. Barnhart, 453 F.3d 559, 562 (4th Cir.2006) (citing S.S.R. 96-8p).

A light work job "requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. §§ 404.1567(b) and 416.967(b).  When doing sedentary work, "periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday."  Kelley v. Apfel, 185 F.3d 1211, 1214 (11th Cir. 1999).

In summary, the ALJ's reasons for discrediting Plaintiff's pain testimony are not supported by substantial evidence in the record.  Of special importance, the ALJ misread Dr. Lipnick's 2003 opinion, and therefore failed to give it great weight.

---

[17] The footnote to this passage qualifies that the "8 hours a day, for five days a week" requirement only applies to an RFC determination at Step 5.  "The ability to work 8 hours a day for 5 days a week is not always required when evaluating an individual's ability to do past relevant work at step 4 of the sequential evaluation process." S.S.R. 96-9p, footnote 2.  The residual functional capacity assessment here, however, was at Step 5.  It is uncontested that at Step 4, Plaintiff does not have the residual functional capacity to do heavy work and therefore cannot perform his past relevant work as a commercial fisherman.

Another remand is not recommended, however.  The record contains the opinion of the treating physician, and his medical records and the contemporaneous tests provide sufficient evidence to establish an onset date.

The earliest MRI, on November 19, 1999, found a reduction in disc signal at L3-4, L4-5, and L5-S1, which indicated "disc dehydration and degeneration" and mild central disc bulge at L4-5 and L5-S1.  R. 221.  Degenerative disc changes were noted at L3-4, L4-5, and L5-S1.  *Id.*  This MRI, standing alone without clinical findings by a treating physician, would not be enough to find onset of disability.  Moreover, Plaintiff does not allege onset of disability until July 1, 2000.

Plaintiff first saw Dr. Lipnick on July 26, 2001, and it was not until that time that objective medical evidence of his condition began to collect.  Dr. Lipnick found that Plaintiff had muscular rigidity bilaterally in the parathoracic and lumbar regions, reduced spinal range of motion for flexion, extension, side bending, and rotation, and some decrease in sensation over the right calf and right foot.  R. 338.  Dr. Lipnick's diagnosis was chronic back pain, failed back, depression with generalized anxiety disorder, rule out L5 radiculopathy, chronic narcotic usage, and chronic vocational dysfunction.  R. 339.  *Id.*  Dr. Lipnick prescribed OxyContin and ordered an EMG.  R. 340.  The EMG was performed on August 9, 2001.  R. 334.  It was an abnormal study showing right S1 radiculopathy.  *Id.*  This was objective medical evidence confirming the severity of Plaintiff's experience of pain and supported Dr. Lipnick's 2003 opinion as to Plaintiff's disability.

Thereafter, Dr. Lipnick repeatedly examined Plaintiff and prescribed strong pain medications.  As discussed at length above, from July 26, 2001, forward, Dr. Lipnick

made repeated objective medical findings supportive of his opinions rendered in 2003 and 2004, and also supportive of Plaintiff's pain testimony.

Additionally, the record contains the results of three MRIs during this period, and these tests further confirmed the treating physician's opinion and Plaintiff's testimony. On May 29, 2001, Plaintiff had another MRI.  R. 182.  While the report found "no bony malignancies, fractures, nor displacements," there was a loss of signal at the L3 through S1 discs, and at the L4-L5 level, "slightly enhancing peridural scar tissue on the right side" was observed, "*which may be involving the right L5 root.*"  *Id.* (emphasis added).

Another MRI was conducted on January 11, 2002.  R. 315.  The report noted mild degenerative disc disease with mild annular disc bulging at L5-S1 with moderate facet arthritis on the right.  *Id.*  A small central-right paracentral *disc protrusion at L4-L5*, and mild degenerative disc disease at L3-L4 and L4-L5 were observed.  *Id.*  Grade one spondylolisthesis at L5-S1 was also noted.  *Id.* (emphasis added).

A third MRI was performed on May 31, 2003.  R. 269.  At the L3-L4 level, enhancing epidural scar formation was found on the right, with a small recurrent disk protrusion within the scar.  *Id.*  It was thought that this, "if significant, *could be affecting the traversing right L4 nerve root.*"  *Id.* (emphasis added).  At the L4-L5 level, mild epidural scar formation was seen on the right, but without evidence of recurrent disk herniation.  *Id.*  However, there was "*[m]oderate to advanced right neural foraminal narrowing . . . present which could be impinging on the exiting right L4 nerve root*" and "*could contribute to right L4 symptomatology.*"  *Id.*  At the L5-S1 level, there was no significant epidural scar formation or evidence of recurrent disk herniation, and there did not appear to be any nerve root compression.  R. 269-270.  The report said that "[w]ith

the exception of the small recurrent disk protrusion at L3/4 on the right, there has been little or no significant change at the other levels since the prior study."  R. 270.

In summary, the MRIs were also supportive of Dr. Lipnick's opinion and Plaintiff's pain testimony.  While disc herniation or fragmentation was not reported in the four earlier MRIs, there was evidence of protrusion and possible impingement at the L4 or L5 level that could have been the cause of Plaintiff's pain.

Since Dr. Lipnick's objective findings remained essentially unchanged from the first time he examined Plaintiff, and since his 2003 opinion as to Plaintiff's ability to do work is based entirely upon his treating experience over the prior two years, there is a sound basis to conclude that the onset of Plaintiff's disability was July 26, 2001.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge did not correctly follow the law and are not based upon substantial evidence in the record.  The decision of the Commissioner should be reversed and the Commissioner ordered to award benefits to Plaintiff based upon an onset date of July 26, 2001.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **REVERSED** and the Commissioner be **ORDERED** to grant Plaintiff's application for benefits with an onset of disability on July 26, 2001.

**IN CHAMBERS** at Tallahassee, Florida, on December 31, 2008.


s/     William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 10 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.